**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **E-Z Serve Convenience Stores, Inc.,** | ) | Case No. 02-83138 |
| | ) | |
| Debtor. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| **Richard M Hutson, II, Chapter 11** | ) | |
| **Trustee for E-Z Serve Convenience** | ) | |
| **Stores, Inc.,** | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 04-09172 |
| | ) | |
| v. | ) | |
| | ) | |
| **Greenwich Insurance Company and** | ) | |
| **Avalon Risk Associates, Inc.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**MEMORANDUM OPINION**

This matter came before the Court on July 19, 2007, after notice to all parties in interest, in Durham, North Carolina, upon cross-motions for summary judgment. Vicki L. Parrott, Emily C. Weatherford, and John A. Northen appeared on behalf of the Trustee. Lillian Watson and Stuart J. Glick appeared on behalf of Greenwich Insurance Company and Avalon Risk Associates, Inc. Having considered the motions, affidavits, as well as the memorandums of law and arguments of counsel, the court makes the following findings of fact and conclusions of law:

**Procedural Background**

On October 4, 2002 (the "Petition Date"), E-Z Serve Convenience Stores, Inc., (the "Debtor"), E-Z Serve Corporation, SSCH Holding Corporation, Swifty Serve Holding

1

Corporation, and Swifty Serve, LLC filed voluntary petitions under Chapter 11 of the Bankruptcy Code.

On October 4, 2004, the Plaintiff filed a complaint seeking to avoid and recover a payment of $950,000.00 made within ninety days prior to the Petition Date by the Debtor to or for the benefit of Greenwich Insurance Company ("Greenwich") and Avalon Risk Associates, Inc. ("Avalon" and, collectively, the "Defendants") under a theory of preference liability pursuant to 11 U.S.C. § 547. On December 7, 2004, the Defendants timely filed their responsive pleadings and the parties commenced discovery. As a result of information obtained in the discovery process, the Plaintiff moved to amend its complaint to include additional causes of action under 11 U.S.C. §§ 548 and 542. That motion was granted and an amended complaint was filed on December 13, 2005 (the "Complaint").

Pursuant to the parties' joint scheduling memorandum and order, as revised from time to time, Greenwich filed a motion for summary judgment on April 30, 2007 requesting dismissal of the Complaint. On May 21, 2007, the Trustee filed a motion seeking summary judgment on its claims pursuant to §§ 547 and 550(a). The Trustee also disputes the Defendants' contention that the Trustee's claims pursuant to §§ 548 and 550(a) should be dismissed.

**Facts**

At all times relevant to this proceeding, Greenwich was a company engaged in the business of issuing surety bonds. Avalon functioned as Greenwich's general agent and was authorized by Greenwich to perform all tasks associated with the issuance of surety bonds on behalf of Greenwich to customers of Greenwich. Marsh U.S.A., Inc. ("Marsh") was an insurance and bond

broker, and was engaged in the business of procuring insurance and surety bonds for the clients Marsh represented. At all times relevant herein, Marsh was the bond broker for SSCH Holding Corporation, formerly known as Swifty Serve Corporation and its subsidiaries and affiliates, including the Debtor.

Prior to its bankruptcy filing, the Debtor operated a convenience store business through direct ownership, indirect ownership, and the lease of stores located throughout the southeastern United States. The Debtor was subject to a wide variety of state and local laws that imposed requirements that the Debtor provide financial guarantees to certain creditors and governmental entities to assure the Debtor's fulfillment of contractual, statutory, and other undertakings by the Debtor.

On December 18, 2000, Greenwich issued a $1.7 million Money Order/Moneygram Bond among (i) the Debtor as principal; (ii) Greenwich as surety; and (iii) Travelers Express Company, Inc. and/or Moneygram Payments Systems, Inc. as obligees. Contemporaneously with the execution of the Money Order/Moneygram Bond, Swifty Serve Corporation executed a certain Commercial Surety General Indemnity Agreement (the "GIA"). Swifty Serve Corporation was the only entity that signed the GIA. The Debtor was identified as a "Principal" under the GIA. The Debtor was obligated to indemnify Greenwich as its surety.[1]

The parties agree that the GIA contemplated two scenarios under which Greenwich could request that Swifty Serve Corporation furnish Greenwich with collateral. The first scenario is found under Section 2(a)(ii) of the GIA and provides in part:

---

[1] Greenwich contends that the GIA obligates all parties identified as "Principal" under the GIA (including the Debtor) to indemnify Greenwich. The Trustee disputes this contention but concedes that the Debtor had a common law obligation to Greenwich, as its surety.

3

> Undersigned agrees to pay to Surety upon demand: . . . (ii) the amount of any claim made against Surety on any Bond, whether disputed or not. This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any Bond....

The parties dispute whether the GIA obligates all parties identified as "Principal" under the GIA, including the Debtor, to furnish collateral upon demand or whether it obligates only those parties that executed the GIA.

The second scenario under which Greenwich could request that Swifty Serve Corporation furnish Greenwich with collateral is found under Section 3(e) of the GIA:

> Undersigned shall, upon the request of Surety, procure the discharge of Surety from any Bond and all liability by reason thereof. If such discharge is unattainable, Undersigned shall, if requested by Surety, either deposit collateral with Surety acceptable to Surety, sufficient to cover all exposure under such Bond or Bonds, or make provisions acceptable to Surety for the funding of the bonded obligation(s).

Pursuant to the GIA, Greenwich could cancel or terminate the bonds "at its option and in its sole discretion" at any time, including in the event Swifty Serve Corporation failed to satisfy a demand by Greenwich for collateral. The termination of a bond by Greenwich did not trigger an obligation on the part of Greenwich to return collateral deposited by Swifty Serve Corporation because Greenwich remained liable for claims that accrued prior to the termination date for a period of time that varied from bond to bond. Greenwich had the right to voluntarily return collateral deposited with Greenwich at any time. Greenwich also was obligated to return any unused collateral and reimburse any payments provided to it after the bonds were terminated and Greenwich's liability for claims under the bonds had been fully discharged.

Following the execution of the GIA, Marsh made numerous requests to Greenwich on behalf of the Debtor for the issuance of bonds. Greenwich, as surety, issued additional bonds on

behalf of the Debtor, in favor of numerous obligees, at the request of Marsh and the Debtor. All of the bonds Greenwich issued on behalf of the Debtor were covered by and subject to the terms and conditions of the GIA. Over 74% of the bonds Greenwich issued to the Debtor were in the nature of financial guarantee or financial assurance bonds. The Debtor, during the course of its business operations, collected money from customers that was owed to a third party, and the third party creditor often required the Debtor to provide financial guarantees assuring its recovery of sums paid to the Debtor.

In July 2001, Marsh requested an increase in the penal sum of the Travelers Express Company Money Order/Moneygram Bond, and Greenwich subsequently approved a $1.8 million increase in the amount of that bond for a total amount of $3.5 million. In late November and early December of 2001, Greenwich requested additional collateral to secure the bonds as permitted under Section 3(e) of the GIA. Specifically, on December 14, 2001, Greenwich sent a letter to Swifty Serve Corporation in which Greenwich demanded that Swifty Serve Corporation deposit with Greenwich cash or a letter of credit in the amount of $1,750,000.00 within ten days because the company's risk profile had changed "as a result of deterioration in the company's financial condition." On December 21, 2001, Steven Haft, who was the treasurer of Swifty Serve Corporation, sent a letter to Greenwich on the Debtor's letterhead informing Greenwich of its intent to comply with the collateral demand by posting a letter of credit in the amount of $1,750,000.00, but that due to the holiday schedules of the Debtor's investor groups, the Debtor could not do so until January 15, 2002. On January 15, 2002, the Debtor provided Greenwich with an irrevocable letter of credit for $1,750,000.00.

On June 20, 2002, Greenwich sent another letter to Swifty Serve Corporation in which it demanded that Swifty Serve Corporation deposit with Greenwich cash or a letter of credit in the amount of $1,750,000.00 within ten days and indicated that its "failure to do so will be a default under the terms of the General Indemnity Agreement." After receipt of the June 20, 2002 demand letter, the Debtor began the process of reviewing its bonds in an effort to identify bonds that could be cancelled or modified. Greenwich did not terminate the bonds on June 30, 2002. During June and July of 2002, the Debtor identified bonds that could be cancelled and executed bond cancellations and modifications which reduced the face amount of open bonds issued by Greenwich from $6,203,292.00 to $5,430,492.00, and all bonds from $8,060,491.00 to $5,725,491.00. After certain reductions and modifications to the bonds, Greenwich reduced its demand for additional collateral from $1,750,000.00 to $950,000.00.

On July 30, 2002, the Debtor remitted a check in the amount of $950,000.00 (the "Transfer") to Greenwich. The check was deposited by Greenwich on August 1, 2002, and the funds were transferred out of the Debtor's account on August 2, 2002. As of the Transfer Date, no claims had been made or had accrued under any of the bonds. On August 22, 2002, the obligees under the Money Order/Moneygram Bond, the Debtor and Greenwich executed a written rider that reduced the penal sum of that bond from $3.6 million to $3.2 million.

The Debtor's situation continued to deteriorate, and during the period between September 13 through 16, 2002, the Debtor caused Travelers Express Company under the Money Order/Moneygram Bond to suffer losses in an amount not less than $2 million when it failed to remit trust funds to Travelers. On September 20, 2002 ("Termination Date"), Greenwich gave notice to the Debtor that it was terminating all of the open bonds on thirty/sixty days notice in

accordance with their terms.  On October 22, 2002, Travelers filed a claim (the "Travelers Claim") under the Money Order/Moneygram Bond in the full penal amount of $3.6 million.

Since the Termination Date, various obligees under the bonds have filed 16 claims under the bonds, including the Travelers Claim. Fourteen of the claims have been settled, and the sum of $2,537,922.63 has been paid out by Greenwich on those 14 claims. The aggregate total amount of all of the claims exceeds $2,700,000.00.

## Summary Judgment Standard

The standard for summary judgment is set forth in Fed. R. Civ. P. 56, which is made applicable to this proceeding by Bankruptcy Rule 7056.  Rule 56 provides that the movant will prevail on a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 330(1986).

Under Rule 56, the movant has the initial burden of establishing that there is an absence of any genuine issue of material fact, and all reasonable inferences must be drawn in favor of the nonmoving party. Celotex, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the nonmoving party must present some evidence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  If the nonmoving party responds satisfactorily, the motion for summary judgment shall be denied, and the case proceeds to trial.

## The Trustee's Preference Claim

To prevail on summary judgment, the Trustee has must establish the six elements of a preference claim: (1) the transfer of an interest of the debtor in property; (2) the transfer was

made to or for the benefit of a creditor; (3) the transfer was made for or on account of an antecedent debt; (4) the transfer was made while the debtor was insolvent; (5) the transfer was made within 90 days of the petition date; and (6) the transfer resulted in the creditor receiving a greater distribution than a hypothetical Chapter 7 distribution.  11 U.S.C. § 547(b).  The Trustee has the burden of establishing all six elements of a preference claim.  11 U.S.C. § 547(g). Whether or not each element has been established is a question of law.  First Fed. of Mich. v. Barrow, 878 F.2d 912 (6th Cir. 1989).

The parties do not dispute that the Transfer was of an interest of the Debtor in property, made within 90 days of the petition date, while the Debtor was insolvent, and that the Transfer resulted in the Greenwich receiving a greater distribution than a hypothetical Chapter 7 distribution.  Furthermore, the parties agree that there are no material facts in dispute with regard to the Trustee's § 547 claim.  The Defendants, nevertheless, contend that the Trustee cannot establish all six elements of its claim because, based upon the undisputed facts, Greenwich was not a creditor of the Debtor with an antecedent debt at the time the Transfer was made.  The Defendants conclude that, as a result, the Trustee's preference claim must be dismissed as a matter of law.

Section 101(10) of the Bankruptcy Code provides that the term "creditor" refers to an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor..."  11 U.S.C. § 101(10).  Section 101(5) defines the term "claim" as

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment.

Courts have interpreted the statutory definitions of the terms claim and creditor expansively. In In re Cybermech, Inc., 13 F.3d 818 (4th Cir. 1994), the Fourth Circuit addressed the issue of whether a debtor-seller's return of a down payment to a purchaser on a contract for the purchase of machines constituted a preferential transfer. The court found that "Congress gave the 'broadest possible definition' to the term 'claim' in order to ensure that 'all legal obligations of the debtor, no matter how remote or contingent, [would] be dealt with in the bankruptcy case.'" Id. at 821. (citing S.REP. NO. 989, 95th Cong., 2d Sess. 22, reprinted in 1978 U.S.C.C.A.N. 5787, 5808). The Fourth Circuit held that, given the broad definition of the term "claim," once the debtor-seller accepted the purchaser's down payment, the purchaser held a contingent claim and was a "creditor." Id.

Based upon the plain language of the Bankruptcy Code, as well as the relevant case law,[2] the court concludes that Greenwich was a creditor at the time of the Transfer. Greenwich was obligated to pay any claims made by obligees under the bonds as the Debtor's surety. The Debtor, in turn, was obligated to indemnify Greenwich for any such payments. As a result, Greenwich had a contingent claim against the Debtor for reimbursement that became fixed if and when a claim was made against a bond. As an entity that had a claim against the Debtor, Greenwich was a creditor.

---

[2] The Fourth Circuit has applied this broad definition of the word "claim" in numerous other settings as well. See, e.g., In re Leckie Smokeless Coal Co., 99 F.3d 573 (4th Cir. 1996) (holding that obligations imposed by the Coal Act which established that the debtors would be liable for future Coal Act premiums absent a change in the law, fell within the bankruptcy definition of a prepetition claim); Butler v. NationsBank, N.A., 58 F.3d 1022 (4th Cir.1995) (finding that a bank had a "claim" as soon as a Chapter 7 debtor deposited a fraudulently endorsed check into the bank, even though bank did not yet have knowledge of the forgery).

While the Bankruptcy Code defines a "creditor" is an entity that has a claim, it defines a "debt" as a liability on a claim. 11 U.S.C. § 101(12). From these definitions, it follows that where a claim exists, there is both a creditor and a debt. "The definition of 'debt' can therefore be restated as 'a liability for payment, whether or not such liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'" In re Enron Corp., 357 B.R. 32, 46-77 (Bankr. S.D.N.Y. 2006) (quoting 11 U.S.C. § 101(5)). "In other words, when a creditor has a claim against a debtor-even if the claim is unliquidated, unfixed, or contingent-the debtor has incurred a debt to the creditor." Energy Coop., Inc., 832 F.2d 997, 1001 (7th Cir. 1987). In Cybermech, therefore, the Fourth Circuit found that a "debt" was created on the same date that the purchaser obtained its contingent claim. 13 F.3d at 822. Because the purchaser's contingent claim came into existence when debtor-seller accepted the purchaser's down payment, so did the debt. Id. As a result, the Fourth Circuit concluded that refund payment to the purchaser was on account of an antecedent debt. Id.

The Defendants urge the court to use a "common sense" approach to determine whether the Transfer was made on account of an antecedent debt. They assert that there was no antecedent debt because Greenwich would not have had a claim for money damages against the Debtor at that point in time, if the Debtor had failed to make the $950,000.00 Transfer. The Defendants' argument simply highlights the contingent nature of its claim. The same argument could be made for many contingent claims. The fact that a contingency has not yet been triggered does not insulate a creditor from a preference action. See generally In re Enron, 357 B.R. at 32 (describing the range of contingent claims that have been recognized to create an

10

antecedent debt). A debt is incurred when a debtor first becomes legally obligated to pay. See In re Barefoot, 952 F.2d 795, 799 (4th Cir. 1991). In this case, the Debtor became legally bound, on the date the bonds were issued, to pay Greenwich in the event a claim was made by an obligee.

The court concludes that the Trustee has met his burden of establishing the six elements of a preference claim under § 547. Greenwich was the holder of a contingent claim as a result of the bonds, therefore the Transfer was made to or for the benefit of a creditor. The liability on that contingent claim was a debt that came into existence when Greenwich issued the bonds, which was prior to the date of the Transfer. Thus, the Transfer was made for, or on account of, an antecedent debt. Based upon the foregoing, the Defendants' motion for summary judgment dismissing the Trustee's preference action will be denied. The court cannot, however, make a determination as to the Trustee's cross-motion for summary judgment on the preference claim without first addressing the Defendants' affirmative defenses.

### The Defendants' Ordinary Course of Business Defense

The Defendants have asserted an ordinary course of business defense pursuant to § 547(c)(2) and a new value pursuant to § 547(c)(1) and (4).[3] The Defendants have the burden of

---

[3] In its Answer, Greenwich asserted a defense pursuant to § 547(c)(1), a contemporaneous exchange of new value. While Greenwich did not specifically plead a subsequent new value defense under § 547(c)(4), the court finds that consideration of this defense at this juncture will not unduly prejudice the Trustee. Accordingly, the court will consider the merits of this defense.

11

proving the nonavoidability of a transfer under § 547(c).  See 11 U.S.C. § 547(g).  Section 547(c)(2)[4] provides that the trustee may not avoid a transfer

> (2) to the extent that such transfer was--
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms.

In order to prevail on an ordinary course of business defense, the creditor must establish all three elements set forth in § 547(c)(2).  In re Jeffrey Bigelow Design Group, Inc., 956 F.2d 479, 486 (4th Cir. 1992).  "This inquiry is 'peculiarly factual.'"  Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1047 (4th Cir. 1994) (internal citations and quotation marks omitted).  First, the creditor must show that the debt was incurred in the ordinary course of business or financial affairs of the debtor and the creditor. 11 U.S.C. § 547(c)(2)(A). "This means that the incurring of the debt would be a 'logical and ordinary action for these parties.'" In re Gem Const. Corp. of Va., 262 B.R. 638, 655 (Bankr. E.D.Va. 2000) (quoting In re Jeffrey Bigelow Design Group, Inc., 956 F.2d at 488).  Pursuant to § 547(c)(2)(B), the creditor must also prove that the debtor made the transfer in the ordinary course of business between the parties.  This subsection requires a fact specific examination of the course of dealings between particular parties in the case.  In re Air South Airlines, Inc., 247 B.R. 165, 171 (Bankr. D.S.C. 2000).  Lastly, the creditor must show that the transfer was made in accordance with ordinary business terms. 11 U.S.C. § 547(c)(2)(C).  In determining whether a transfer was made according to ordinary

---

[4] This case arose prior to the enactment and effective date of BAPCPA, therefore BAPCPA's amendments to Section 547(c)(2) are not applicable.

business terms, the court must make an objective analysis using norm in a creditor's industry. Advo-System, Inc. v. Maxway Corp., 37 F.3d at 1048.

The Trustee argues that the ordinary course defense is not available to Greenwich because Greenwich cannot establish at least one element set forth in § 547(c)(2)(B): that the Transfer was made in the ordinary course of business or financial affairs of the Debtor and Greenwich. The Trustee points to evidence that the Transfer was not made by the due date originally established by Greenwich, was in an amount less than the amount originally demanded, and was made reluctantly only after Greenwich threatened to terminate the bonds.

In support of its ordinary course defense, the Defendants have presented some evidence that the Transfer may have been in keeping with the ordinary course of dealings between Greenwich and the Debtor. Greenwich presented the Declaration of Scott Adams, president of defendant Avalon, in which he detailed that Greenwich monitored the Debtor's financials and evaluated its own collateral position throughout its relationship with the Debtor. Specifically, Greenwich provided evidence that, prior to the demand that prompted the Transfer, it had made a demand for collateral because of a change in the Debtor's risk profile and had in fact received that collateral. Greenwich also points to the fact that the GIA contained an express provision that allowed Greenwich to request collateral at its discretion, and that Greenwich's demand for collateral was consistent with the GIA.

The court finds that the Defendants have presented sufficient evidence to raise genuine issues of material fact for trial as to the disputed § 547(c)(2) elements. First, material issues of fact exist as to whether the Transfer was made according to ordinary business terms. In addition, Greenwich presented some evidence to create an issue of material fact as to whether the demand

for the Transfer was in the ordinary course of dealings between the parties.  Lastly, while there is less evidence that the Transfer was actually made in the ordinary course, the court finds that it is sufficient to withstand summary judgment.  The evidence shows that a similar demand for additional collateral, which was made on December 14, 2001, resulted in a transfer in the form of a letter of credit of the full amount demanded approximately 31 days later, on January 15, 2002.  From the face of the evidence, it appears that any delay in making this payment was caused by holiday schedules.  In contrast, the Transfer at issue was made after a demand on June 20, 2002 approximately 40 days later, but in an amount less than what was originally demanded and in cash.  The delay in the latter instance was caused by the Debtor's attempts to identify bonds that could be cancelled.  Whether the differences in the circumstances surrounding these two transfers is so significant as to defeat the ordinariness of the Transfer is factual inquiry that cannot be resolved on summary judgment.  Therefore, the court will not find at this stage of the case that Greenwich is not entitled to the benefit of the ordinary course of business defense as a matter of law. [5]

## The Defendants' New Value Defense

The Defendants have also asserted the "subsequent new value" defense under § 547(c)(4).  This section  provides that a trustee may not be avoid a transfer

---

[5] The court notes that on June 22, 2007, the Trustee filed a motion seeking to limit Greenwich's use of their expert witness, Carol Andrews, and her expert report to the extent either were introduced for the purpose of establishing any element of the ordinary course of business defense.  Greenwich did not identify Ms. Andrews as an expert prior to the deadline set by the scheduling memorandum and order in this adversary proceeding.  This motion was heard on the same date as the summary judgment motions.  The court denied the Trustee's motion but ordered that the Trustee be afforded additional time in which to identify a rebuttal expert witness and submit a report.  Because the court is not granting the Trustee's Motion, the Trustee is therefore entitled to identify an expert and submit a report rebutting the report of Ms. Andrews.

> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--
> (A) not secured by an otherwise unavoidable security interest; and
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4). New value is defined as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2). Essentially, pursuant to § 547(c)(4), any new value given by a creditor may be applied to offset any prior preferential payments so long as the debtor does not make an otherwise unavoidable transfer on account of the new value. In re JKJ Chevrolet, Inc., 412 F.3d 545, 552 (4th Cir. 2005). The new value defense seeks to encourage creditors to continue doing business with financially troubled debtors. See, e.g., In re Armstrong, 291 F.3d 517, 525 (8th Cir. 2002); In re Schabel, 338 B.R. 376, 380 (Bankr. E.D. Wis. 2006); In re Teligent, Inc., 315 B.R. 308, 315 (Bankr. S.D.N.Y. 2004); In re Check Reporting Serv. Inc., 140 B.R. 425, 437 (Bankr. W.D. Mich. 1992).

Greenwich contends that in exchange for the $950,000.00 Transfer, the Debtor received subsequent new value in the form of bond coverage that it would not have otherwise received. Greenwich reasons that if the Debtor had not agreed to furnish additional collateral, it had the contractual right to cancel the bonds as of July 1, 2002. If Greenwich had cancelled the bonds, the Debtor would have retained the $950,000.00 Transfer, but lost over $8 million in bond coverage and incurred the cost of obtaining alternative bonds. Because of the Transfer, Greenwich maintained the bonds in place, continued to offer a bond facility to issue new bonds,

15

and became obligated to pay millions of dollars of claims subsequently made against those bonds. Greenwich declined to exercise its contractual termination right, continued to maintain the bonds only because the Debtor timely met Greenwich's demand, and further asserts that it even increased the face amount of a bond that was in force in August 2002. Moreover, Greenwich contends that the facts show that it actually used the proceeds of the Transfer to satisfy obligations of the Debtor.

In response, the Trustee contends that the circumstances described by Greenwich merely constitute forbearance, and that forbearance cannot be new value. The Trustee has also submitted an expert report as evidence that the Debtor received no value for the Transfer. The majority of courts agree that forbearance is generally not new value. See, e.g., In re ABC-Naco, Inc., 483 F.3d 470, 474 (7th Cir. 2007); In re Eleva, Inc., 235 B.R. 486 , 489-90 (10th Cir. BAP 1999); In re Pameco Corp., 356 B.R. 327, 339 (Bankr. S.D.N.Y. 2006); In re George Transfer, Inc., 259 B.R. 89, 95 (Bankr. D. Md. 2001); In re Riggs, 129 B.R. 494, 497 (Bankr. S.D. Ohio 1991). The reasoning behind this principle is that forbearance from exercising a preexisting right in return for an overdue payment is not an extension of "new value," but is simply the substitution of a new obligation for an existing obligation. In re Riggs, 129 B.R. at 497. An obligation substituted for an existing obligation is explicitly excluded from the definition of new value pursuant to § 547(a)(2).

The court must concur with the Trustee that much of what Greenwich labels as "new value" has some of the characteristics of forbearance. Greenwich had the right to terminate the bonds as of July 1, 2002 as a result of the Debtor's breach of the GIA. It did not terminate the bonds; however, it continued to threaten termination. Thirty days later, on July 30, 2002, the

Debtor paid Greenwich $950,000.00.[6]  Because of the Transfer, Greenwich then refrained from terminating the GIA.  This sequence of events essentially describes an act of forbearance on the part of Greenwich.

Nevertheless, while the Trustee argues that the "value" that Greenwich allegedly gave to the Debtor is no different than that which is given in any case of forbearance by a creditor of an existing right, at this juncture in the case, the court cannot rule out the possibility that Greenwich may have provided new value in the form additional bond coverage from the date of the Transfer to the date of termination on September 20, 2002.  At the very least, Greenwich supplied a factual issue as to the value to be placed upon this additional bond coverage. Therefore, the Trustee's motion for summary judgment will be denied.

## The Trustee's Fraudulent Transfer Claim

The Trustee asserts in the alternative that the Transfer paid to Greenwich is avoidable under 11 U.S.C. § 548 as a fraudulent transfer.  The Trustee has not moved for summary judgment on this claim.  The Defendants, however, have moved for summary judgment dismissing this cause of action.  To ultimately prevail on this claim, the Trustee has the burden of proving that   1) the Transfer was of an interest of the Debtor in property; (2) the Transfer was made within one year of the petition date; (3) the Debtor received less than a reasonable equivalent value in exchange for the Transfer; and (4) the Transfer was made while the Debtor was insolvent.  The only element of the fraudulent transfer claim that is in dispute is whether the Debtor received less than a reasonably equivalent value in exchange for the Transfer.

---

[6] While Greenwich states that the Debtor "timely" met its demand for further collateral, the timeliness of the Transfer is a fact in dispute.

Whether a transfer is for reasonable equivalent value is a fact-driven determination based upon a review of the circumstances of a particular case.  In re Summit Place, LLC, 298 B.R. 62, 73 (Bankr. W.D.N.C. 2002) (citing In re Bennett Funding Group, Inc., 220 B.R. 743, 769 (Bankr. N.D.N.Y. 1997).  In support of his § 548 action, the Trustee has submitted an expert report which includes a finding that the Debtor received no value for the Transfer.  While the Defendants dispute this fact, the Trustee has presented evidence sufficient to establish the existence of an issue of material fact precluding summary judgment.  Therefore, the Defendants' motion for summary judgment dismissing the Trustee's fraudulent transfer claim will be denied.

Based on the foregoing, an Order will be entered contemporaneously with the entry of this Memorandum Opinion denying the motions for summary judgment.

**SERVICE LIST**

John A. Northen
Vicki Parrott
Emily Weatherford
P. O. Box 2208
Chapel Hill, NC 27514-2208

Richard M. Hutson, II
P. O. 2252-A
Durham, NC 27702

Stuart J. Glick
One Riverfront Plaza
Newark, NJ 07102

Lillian Watson
Julie B. Pape
One W. Fourth Street
Winston Salem, NC 27101

Michael D. West
P. O. Box 1828
Greensboro, NC 27420-1828